244 A.2d 258.

STATE *vs.* MARC MICKEY PAGE.

JULY 17, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

</div>

KELLEHER, J.  This is an indictment for murder.  The
defendant was tried before a jury in the superior court and
found guilty of murder in the first degree.  The trial justice
denied the defendant's motion for a new trial.  The case is
before us on his bill of exceptions.

Annie M. Greene was a well-known schoolteacher who
lived alone in a secluded part of the town of Exeter.  She
was killed in the kitchen of her cottage in the late after-
noon of June 15, 1960.  At the time of her death, Mrs.
Greene, who was a widow, was approximately 70 years old.
Her body was discovered at about 9:30 o'clock the follow-
ing morning.  Death was due to a hemorrhage and shock
following multiple fractures of the skull. The fractures had
been produced by numerous blows of a blunt instrument
identified at the trial as a claw hammer.

Upon discovery of the body, the state police were sum-
moned.  They immediately commenced an investigation.
The defendant had lived in Exeter and knew the deceased.
He had been paroled from prison five days before the crime
in question on June 10, 1960.  These facts, together with
defendant's past record of crimes of violence made him a
prime suspect.  In the late afternoon the focus of the in-
vestigation shifted from Exeter to the city of Providence
when the deceased's station wagon was found abandoned
on Westminster Street.  Two hours later, defendant was
apprehended in Providence and taken to that city's police
headquarters.  He admitted killing Mrs. Greene and then
driving her motor vehicle to Providence where he left it
on Westminster Street.  He was returned to the Greene
property where he showed the police the location of the
murder weapon.  The defendant was then taken to the

state police barracks in Hope Valley where he signed three written statements[1] which expanded on the sketchy account he had given in Providence of his activities on June 15. The last statement given by defendant was obtained by the police after they had received certain information from the state pathologist relative to the autopsy performed on Mrs. Greene. In that statement, defendant said that he had raped the deceased and then killed her because she had said she was going to report his actions to the authorities. The defendant was charged with murder and the present indictment was returned by the Washington County grand jury during the latter portion of June, 1960. The defendant filed a general plea of not guilty and a special plea of not guilty by reason of lack of sufficient mental capacity.

The trial began in superior court November 21, 1960. One of the state's witnesses was Captain Arthur J. Newton. This officer who was the head of the detective division of the state police was in charge of the investigation which led to defendant's arrest. While under cross-examination, the captain testified that during the time this homicide was being investigated all of his subordinates (over 40 in number) rendered oral reports to him as to the manner in which they carried out their assigned duties.

Captain Newton said that he had reduced these reports to writing and compiled them in a document which was on file in his office at state police headquarters in Scituate. Defense counsel thereupon made a motion that the trial justice order the witness to produce the document as an aid in his cross-examination of the witness. The trial judge denied this request. It is this denial which provides the basis for defendant's first exception.

---

[1]The interrogation and trial of this defendant took place in 1960. Consequently the rules set forth in *Escobedo* v. *State of Illinois,* 378 U. S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977; *State* v. *Mendes,* 99 R. I. 606, 210 A.2d 50, or *State* v *Dufour,* 99 R. I. 120, 206 A.2d 82, are not applicable. See *State* v. *Franklin,* 103 R. I. 715, 241 A.2d 219.

# I

Use of the State Police File for Impeachment Purposes

In urging that this file be made available to him, defendant relies on the holding in *Jencks* v. *United States*, 353 U. S. 657, 77 S. Ct. 1007, 1 L.Ed.2d 1103. In *Jencks*, the United States Supreme Court ruled that a defendant in a federal criminal proceeding should have access to pretrial statements for impeachment purposes submitted by a witness to the government concerning activities about which the witness testifies at trial—without the necessity of the defendant first establishing a conflict between the witness's testimony and his pretrial statement. Congress reacted to the *Jencks* decision and on September 2, 1957, enacted Pub. L. 85-269, 71 Stat. 595, now cited as 18 U.S.C.A., §3500, which limited to some extent the *Jencks* decision by providing that upon objection by the government the requested statement shall be first examined by the trial justice in camera for a determination of its relevancy. Later in *Palermo* v. *United States*, 360 U. S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, Justice Frankfurter in speaking for the court observed that the rule in *Jencks* was not grounded on any constitutional right but was promulgated by the Court in the exercise of its power to provide procedures for the administration of justice in the federal courts.

Although the *Jencks* case is not binding in state courts, it has led to a consideration and reconsideration in several jurisdictions as to a defendant's right to pretrial statements of the prosecution's witnesses. It appears that various states are about evenly divided[2] as to whether they will or will not follow the federal rule.

---

[2]States adopting the *Jencks* rule: *People* v. *Wolff,* 19 Ill.2d 318, 167 N.E.2d 197; *People* v. *Rosario,* 9 N. Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881; *State* v. *Saenz,* 88 Ariz. 154, 353 P.2d 1026; *People* v. *Chapman,* 52 Cal.2d 95, 338 P.2d 428; *State* v. *Hutchins,* 1 Storey 100, 51 Del. 100, 138 A.2d 342; *Walker* v. *State,* 78 Nev. 463, 376 P.2d 137; *State* v. *Hunt,* 25

In Rhode Island we have no controlling decision on this question. We came close to it recently in *State* v. *Bradshaw,* 101 R. I. 233, 221 A.2d 815, where this court held that where a police officer has testified that he refreshed his recollection by consulting his report before taking the stand, the defense was entitled to examine the report and use it in its cross-examination of the officer. Although in *Bradshaw* we stated that *Jencks* gave strong support for our holding, we do not believe that it affords any strength for the position espoused by defendant in the instant appeal. In his testimony Captain Newton plainly declared that he did not refresh his recollection prior to the trial as to information contained in the documents requested by the defense. Nothing has been shown by defendant in this appeal that would lead us to conclude that Newton had jogged his memory as to what took place during the course of the investigation by a prior preparatory reading of the police reports. On the contrary, we accept the witness's assertion that his testimony was based on his present recollection of the events and circumstances which occurred during the investigation over which he presided in a supervisory capacity. Hence, the *Bradshaw* rule is inapplicable here.

Let us now examine the applicability of the *Jencks* rule to the present case. In *Jencks,* the court described the basic requirements which must be established before the mo-

N. J. 514, 138 A.2d 1; *Commonwealth* v. *Smith,* 412 Pa. 1, 192 A.2d 671; *State* v. *Lavallee,* 122 Vt. 75, 163 A.2d 856; *State* v. *Richards,* 21 Wis.2d 622, 124 N.W.2d 684; *State* v. *Thompson.* 273 Minn. 1, 139 N.W.2d 490.

States rejecting the *Jencks* rule: *Mabry* v. *State,* 40 Ala. App. 129, 110 So.2d 250; *State* v. *Pikul,* 150 Conn. 195, 187 A.2d 442; *Anderson* v. *State,* 239 Ind. 372, 156 N.E.2d 384; *State* v. *Hill,* 193 Kan. 512, 394 P.2d 106; *McKenzie* v. *State,* 236 Md. 597, 204 A.2d 678; *State* v. *Aubuchon,* Mo., 381 S.W.2d 807; *Erving* v. *State,* 174 Neb. 90, 116 N.W.2d 7; *Gaskin* v. *State,* 172 Tex.Cr. 7, 353 S.W.2d 467; *State* v. *Robinson,* 61 Wash.2d 107, 377 P.2d 248; *State* v. *Kelly,* 249 Iowa 1219, 91 N.W.2d 562; *Anderson* v. *State,* 207 Tenn. 486, 341 S.W.2d 385; *Noel* v. *State,* 247 Ind. 426, 215 N.E.2d 539.

tion to produce will be entertained by the trial court. In doing so, it cited *Gordon* v. *United States,* 344 U. S. 414, 73 S. Ct. 369, 97 L.Ed. 447, wherein a proper foundation for such a motion was described as one where the (1) demand was for specific documents and did not propose any broad fishing expedition among the documents possessed by the government in the hope that something impeaching might turn up, (2) the demand was for statements taken from persons offered as the witnesses, and (3) the material sought must be relevant, competent and outside of any exclusionary rule. The defendant's request, in our opinion, did not satisfy the prerequisites as set forth in *Gordon.*

We think the *Jencks* case is clearly distinguishable from the one at bar. First, the documents sought in *Jencks* were reports written by witnesses as to events which the witnesses personally observed and about which they were testifying. In the present case, defendant seeks access to a document which is to a large extent a synthesis of reports made by officers other than the witness, most of whom were not scheduled to call to testify at the trial. Thus, the defense was seeking a report which was saturated with exclusionary hearsay and therefore outside the scope of *Jencks.* Secondly, in *Jencks* the motion for production was directed to a singularly identified, highly relevant and material set of documents which contained, theoretically at least, a written account of the precise matters about which the witnesses were testifying. In the instant case, however, defendant offered a blunderbuss motion for a report which contained heaps of irrelevant, meaningless, and unimportant detail about which the witness was not testifying. In effect, to permit defendant to probe the supervisory report prepared by Newton would have been equivalent to the issuance to defendant of a veritable license to engage in a fishing expedition of the type specifically proscribed

in *Gordon*. We therefore believe that the rule in *Jencks* is inapposite for purposes of this case and accordingly hold that the trial justice properly denied defendant's request for the state police report.

Likewise, we also overrule defendant's exception to the court's refusal to allow counsel to ask a question of Captain Newton as to whether his recollection was as of the time of the investigation or at some later time. At the time this question was posed, the court was conducting an inquiry in the absence of the jury as to the voluntariness of certain answers given to certain questions by defendant in the Providence police station. Whether the witness was or was not testifying from memory was not germane to the issue then before the court, and defendant's question was therefore irrelevant. The defendant did ask this witness several times while the jury was present if he had used the headquarters' file to refresh his memory prior to his testifying in court. Captain Newton insisted that he had not. The witness stated that he was testifying from memory as to the events which transpired five months earlier. Accordingly, defendant's exception above is overruled.

## II

### The Insanity Issue

In Rhode Island, a defendant, if he raises the issue of his insanity, has the burden of proof with respect thereto and a court can instruct the jury that a presumption of the defendant's sanity survives unless they are convinced that the defendant is insane. *State* v. *Quigley*, 26 R. I. 263, 58 A. 905; *State* v. *Harris*, 89 R. I. 202, 152 A.2d 106. As part of meeting his burden, defendant first summoned to the stand Dr. Robert R. Mezer. Doctor Mezer stated that he had been hired by the state and at its request had been present in court observing defendant since the trial began nine days ago. He also testified that he had studied cer-

tain psychiatric and other records and documents concerning defendant which had been furnished to him by the state. When the doctor volunteered the statement that the attorney general would not prosecute a defendant whom the physician thought insane, defense counsel summarily excused the witness from the stand. The state did not cross-examine the doctor but expressly reserved its right to call him in rebuttal.

The defense thereupon introduced into evidence as full exhibits certain records of the department of social welfare. This is the department of state government charged with the operation of our penal institutions. Included among these documents were certain records of the department's division of mental hygiene services. These records were the results of examinations made of defendant by the division's psychiatrists and psychometrists during the time defendant was in jail prior to his June 10 parole. The defense not only introduced the records into evidence but they were read aloud to the jury. Letters sent by defendant to various individuals while he was imprisoned in 1954-55 were also read to the jury.

The defendant took the stand. He admitted knowing the deceased and being in her home on the afternoon of June 15. He claimed that he had an argument with Mrs. Greene and then there was a "flash." He claimed that he hit her once but did not know what happened thereafter; the next thing he remembered was driving the victim's station wagon in Westerly. The defendant said he continued on to Providence and left the motor vehicle at the spot where the police found it. He denied having sexually assaulted the deceased.

After defendant concluded his testimony, Dr. Mezer took the stand as a rebuttal witness. He recited an impressive list of his qualifications. Once again he stated that he had prior to the trial studied the reports of the state's psychia-

trists and psychometrists, certain photographs and other material all of which were now in evidence. He stated that he had been present in the courtroom during the entire trial, had listened to all the evidence, including defendant's testimony. Doctor Mezer then gave an opinion based upon the records in evidence and the testimony he heard that defendant was not suffering from any disease of the mind which would prevent him from knowing the nature and quality of his act or the difference between right and wrong.

The defendant contends that it was error for the superior court to permit the expert witness to give his opinion where it was based in part on the records of certain psychiatrists and psychometrists who did not testify. The use of such records, he claims, is a clear violation of the hearsay rule.

It is our belief that defendant takes nothing by this exception. His position on this issue is rather anamolous for, on one hand he urges that the reports introduced into the record at his instance are not competent evidence upon which Dr. Mezer can base an opinion as to defendant's criminal responsibility, while on the other hand he asks us to believe that these same reports can be legitimately used by the jury in considering his burden in regards to his special plea of insanity. Nonetheless, this strange dichotomy is of no particular consequence here since we believe it is not necessary for us to reach a definite answer on this exception. For even assuming that the trial justice in permitting the psychiatrist to give his opinion was in error, we are unable to see how this prejudiced defendant. Our examination of the transcript fails to uncover one iota of competent evidence from which an inference could be drawn that at the time of the commission of the act complained of here, defendant did not have the mental capacity to know the wrongful nature of what he was doing. In our

opinion the presumption of defendant's sanity remained with him throughout the trial.

In his brief defendant urged that we forsake the M'Naghten rule. In oral argument he conceded that the record is devoid of any evidence probative of the invalidity of the rule. This court in *State* v. *Jefferds,* 91 R. I. 214, 162 A.2d 536, in noting the ever increasing fund of knowledge concerning mental illness said that this increased psychiatric "know-how" had raised serious questions as to the validity of present standards for determining the criminal responsibility of the mentally ill. We held in *Jefferds* that this court would consider the substitution of another test for the M'Naghten rule only upon being supplied with competent evidence to establish its greater efficiency and reliability over our present standards. We reiterate those sentiments here. The defendant's exceptions to questions concerning standards other than set forth in M'Naghten are overruled.

## III

### The Charge to the Jury

The defendant's remaining exceptions pertain to certain portions of the court's instructions which relate to a definition of murder in the second degree and defendant's special plea as to his lack of mental capacity.

The trial justice in her charge outlined to the jury three different degrees of homicide—murder in the first degree, murder in the second degree and manslaughter. At one point in her charge she described murder in the second degree as follows:

> "Where premeditation appears to have existed only for a moment, that is, for a period of time too short to be measurable or appreciable in terms of time element, then the crime is murder in the second degree."

It is defendant's position that this was an erroneous charge. We disagree.

It is now well established in this jurisdiction that for a homicide to be classified as murder there must be shown to have existed premeditation on the part of the accused. We have remarked in earlier cases that the key element in differentiating between first and second degree murder depends on the extent or amount of premeditation exhibited by the defendant's actions. *State* v. *Prescott*, 70 R. I. 403, 40 A.2d 721; *State* v. *Crough*, 89 R. I. 338, 152 A.2d 644. For purposes of defining more clearly the difference between the two degrees of murder, we said in *State* v. *Fenik*, 45 R. I. 309, 121 A. 218, that in order for there to be a finding of first degree murder, premeditation must be proven to have existed for more than a barely appreciable length of time before the killing. In other words, the premeditation must have had more than a momentary existence. To warrant therefore a finding of murder in the second degree, it follows logically that premeditation must be shown to have existed for no more than a moment.

In reviewing the exceptions taken by a defendant to a trial justice's instructions to a jury we are obliged to examine the charge as a whole and if, after doing so, we feel the trial justice correctly and fairly defined and described the law pertinent to the case at hand, we shall overrule the exception. *State* v. *Mantia*, 101 R. I. 367, 223 A.2d 843. In reviewing the instructions in their entirety, we firmly believe the trial justice accurately communicated to the jury the law on first and second degree murder. While it is difficult indeed to draw with precision the line of demarcation between the two degrees, we are satisfied that the law contained in the charge conformed to the principles set forth in *State* v. *Fenik, supra,* and therefore was not erroneous. We see no benefit to be attained by discussing defendant's exception thereto at any greater length save to declare that it is hereby overruled.

As to defendant's second exception to the charge, he in-

vites our attention to a part of one sentence wherein the trial justice discusses the legal consequences of defendant's special plea of lack of mental capacity. The defendant alleges that the court erred in telling the jury that his insanity plea admitted the act. The entire sentence referred to by defendant reads as follows:

> "Now, at the outset, when the defendant sets up insanity as a defense to a crime he is generally taken as admitting his act, but is denying any criminal responsibility for it on the ground, as his plea suggests, that he lacked at the time the necessary mental capacity to appreciate the nature and character and quality of the act or to know that what he did was wrong."

This portion of the charge recites a correct proposition of law which is set forth in *State* v. *Quigley, supra.* There we ruled that a not guilty plea does not bring the insanity of the accused in issue. Such an issue must be brought before the court by way of a special plea which is in the nature of one in confession and avoidance. It was pointed out in *Quigley* that the defense of insanity admits the act but not the crime. We hasten to add, however, that such an admission extends only and is limited solely to the consideration of a special plea beyond which it has no other efficacy in a criminal case. See *Leick* v. *People,* 136 Colo. 535, 322 P.2d 674.

Again, in making the claim that this part of the charge absolved the state from proving the commission of the act, defendant failed to look, as we must, to the entire charge. *State* v. *Mantia, supra.* If he did, he would see, as we do, that the jury were told that they could not consider defendant's special plea unless and until they had deemed him guilty of one of three possible offenses described in the earlier portion of the trial justice's charge, to wit, murder in the first degree, murder in the second degree and manslaughter. The trial justice informed the jury in lucid and concise terms that essentially only two

issues were submitted to them for determination. First, with regard to the killing of Mrs. Greene, they were to decide whether or not defendant killed her and if he did, was it unlawful and was there premeditation. Secondly, if their answers to the first issue were affirmative, then and only then were they to decide whether defendant was criminally responsible for his actions. While we believe that the use of the maxim "the plea of insanity admits the act but not the crime * * *" without further precautionary instructions could well imperil the rights of a defendant, it did not happen here. In her charge the trial justice unequivocally indicated that this admission was only for the purposes of the second plea and could not be considered until the jury was convinced that a crime had been committed.

Finally, defendant alleges that the superior court committed error in telling the jury that no claim was being made that defendant was "insane" at the time of the trial. While we believe that the trial justice's use of the word "insane" was imprecise, it does not in our opinion constitute reversible error. The term insanity, as it is commonly used, signifies an unsoundness of mind, a derangement of the intellect which may be complete or partial and which can and often does vary from time to time. *Thursby* v. *State,* Maine, 223 A.2d 61. Labeling one's condition as that of insanity, however, does not necessarily connote incompetence to stand trial. The legal standard by which an accused's competency to stand trial is determined is different and distinct from a test of whether or not an accused is criminally responsible for the commission of an offense against the law. See *Magenton* v. *State,* 76 S.D. 512, 81 N.W.2d 894. In the context of the present case we can perceive no prejudice accruing to the defendant as a result of the trial justice's remark. The record clearly establishes that at no time did anyone claim that the de-

fendant was incompetent to stand trial. In her remarks to the jury we are firmly convinced the trial justice made it eminently clear that the defendant's special plea questioned his criminal responsibility as of June 15, 1960, the date of the crime, and not his competency to stand trial. These remarks as to the defendant's mental condition at the time of trial were a proper exercise of a trial justice's duty to insure that the jury's attention was directed solely to the issues which were properly before them. We are fully satisfied, after reviewing the entire charge, that the jury were neither confused nor misled nor was the defendant prejudiced in any way by it. Accordingly his exceptions thereto are overruled.

The defendant's exceptions which have been briefed and argued are overruled, those neither briefed nor argued are deemed to have been waived, and the case is remitted to the superior court for further proceedings.

Motion for reargument denied.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, *Luc R. LaBrosse,* Special Assistant Attorney General, for plaintiff.

*James Cardono,* Public Defender, *Eugene F. Toro,* Special Counsel to the Public Defender, for defendant.