In re S— M— W— and M— L— P—,
Children under seventeen
years of age.

Harvey G. SEVITS, Juvenile Officer,
Plaintiff-Respondent,

v.

F— A— P— and M— L— P—,
Defendants,

F— A— P—, Appellant.

No. 25606.

Missouri Court of Appeals,
Kansas City District.

Sept. 7, 1972.

Belt & Klinginsmith, Ronald M. Belt, Macon, for appellant.

Frick & Mayberry, Clifford B. Mayberry, Kirksville, for respondent.

CROSS, Judge.

In an action instituted on behalf of the State of Missouri by the Juvenile Officer of Adair County, under provisions of V.A. M.S. 211.441, the juvenile division of the Circuit Court of Adair County rendered a judgment terminating the parental rights of F— A— P— and M— L— P— in two of four children born of their marriage. Only F— A— P—, the father, appeals.

The petition identifies the two children involved as M— L— P—, born October 2, 1959, in Quincy, Illinois, and S— M— W— P—, born May 1, 1958, also in Quincy Illinois. The parents of those children are stated to be M— L— P—, their mother, "presently" residing in Quincy, Illinois, and F— A— P—, their father, "presently" residing at LaPlata, Missouri. (At the time of filing the parents were separated.) According to allegations of the petition the children were made wards of the court on December 6, 1960, and since that date have been under supervision of the Adair County welfare office. The petition prays the court's order terminating the parental rights of the natural father and mother as to the children on grounds that (a) "defendants for more than one year immediately prior to the filing of this petition have willfully, substantially and continuously neglected said children and refused to give said children necessary care and protection," and that (b) "defendants have for more than one year immediately prior to the filing of this petition, being financially able, willfully neglected to provide said children with the necessary subsistence, education and other care necessary for the health, morals and welfare of said children."

The evidence in this case confirms the allegations of the petition that the children were made wards of the Adair County Juvenile Court following a hearing in December, 1960, and placed under supervision of the Adair County welfare office. Continuously thereafter the two children have remained under jurisdiction of the juvenile court and supervision by the welfare office. Pursuant to the December, 1960, hearing the court further ordered the father to pay $80.00 per month for the support of the two children. Those payments were made until July 10, 1963, at which time the care, custody and control of the children was "placed back" with the parents under supervision of the Division of Welfare. On October 4, 1963, in accordance with the court's order, the juvenile officer again took custody of the children from the parents. In January of 1964, the court denied the parents' motion to set aside the previous order, and in September of 1964, the parents filed a motion to modify the existing custody order. In November, 1964, the court ordered the Division of Welfare to make an investigation as to the children in their care. Thereafter, on July 7, 1965, the petition instituting this action for termination of parental rights was filed, but the cause lay dormant until after the parents, on February 5, 1970, filed a motion to modify the previous order of custody so as to allow them visitation rights with the children. By due notice, that motion was called up for hearing on March 2, 1970. On that date this suit for termination of parental rights and the parents' motion for visitation rights were both tried and submitted to the court under the same evidence heard.

For reasons later to appear, we will not weigh the evidence to determine the merits of the essential issues raised by the pleadings. Consequently, for the purposes of this opinion, a general outline of the evidence adduced at the trial will suffice. Testimony generally supporting the allegations of the petition was given by child welfare workers employed by the Division of Welfare, the juvenile officer, a neighbor of the parents, and by Mr. and Mrs. R— L—, foster custodians of the two children under supervision of the Adair County welfare office. The parents testified on their own behalf. The father testified that he had complied with the court's order upon him to pay the $80.00 monthly allow-

ance for his children's support up until July of 1963, but not thereafter, because he was financially unable to do so. He also testified that the welfare worker discouraged him from trying to make the payments, and that recently he had been advised not to make any support payment until visitation was arranged. The two children were interviewed by the court in chambers in the presence of counsel for the parties. They expressed their desire to remain with their foster custodians.

In an extensive memorandum opinion, the trial court found that the allegations of the petition were sustained by the evidence and, specifically, "that the parents did willfully neglect to provide the children with the necessary subsistence and failed to pay for their care and support while the legal custody of the children was lodged in the foster parents as wards of the court." The court noted, in reference to the issue of failure to support, that the petition for termination was filed in 1965 and that "the allegation was as to failure to support prior to that time." However, the court observed, the issue as tendered by the parties was failure to support to the present time (1970). The court considered the petition to have been amended to that effect and found there was substantial evidence "as to both periods of time". The court also found that it is in the best interests of the children that the parental rights of their natural father and mother be terminated. This latter finding was consistent with testimony considered by the court as reflecting adversely upon the mother's mental and physical capacity to have the responsibility for the children's care, testimony that the father punished the children excessively and also mistreated his wife, and testimony that the parental home and marriage were unstable; also testimony that satisfactory care had been given in the foster home for the past ten years (except for two and one-half months in 1963), and that the foster parents were willing to petition for adoption in the event parental rights of the natural par-

ents be terminated. The court commented that the entry of a judgment terminating the defendants' parental rights would necessarily require that their motion to modify the existing custody provision so as to allow visitation be overruled. Judgment of termination was entered in accordance with the court's findings.

█ Defendant father, hereinafter referred to as appellant, first complains that the petition does not state a cause of action because it fails to state the sex and residence of the children as required by V.A. M.S. Sec. 211.451, which provides, in part, that "The petition for termination of parental rights shall include: (1) The name, sex, and date and place of birth and residence of the child; * * *." Hence, appellant argues, the court to which the petition was addressed acquired no jurisdiction. We attribute no validity to this proposition. The petition designates the children by their respective Christian names M— L— and S— M—, which, by universal understanding, clearly connote that the child named M— L— is of feminine gender and that the child named S— M— is of the masculine sex. Nor do we find any reason to consider that the petition failed to allege the children's residence. It is clearly stated therein that they were "residing in Adair County, Missouri."

█ Appellant's next complaint of error is that notwithstanding "the parents filed a written demand for a jury they were not granted a trial of the issues by a jury", relying upon V.A.M.S. Sec. 211.-481, which provides that "a parent by written demand shall be granted a trial of the issues by a jury." Appellant correctly asserts that written demand for a jury trial was filed. The date of that filing was August 11, 1965, four and a half years prior to the trial. However, when the cause came on for hearing on March 2, 1970, the parents entered into trial before the court without objection and without further reference to their demand for a jury. By so doing, they waived their right

to a jury trial. Section 510.190 V.A.M.S. and Civil Rule 69.01(b) expressly provide that "Parties shall be deemed to have waived trial by jury * * * (4) By entering into trial before the court without objection." [1]

Appellant next contends that no investigative social study was made and filed with the court, as is required by Section 211.491 V.A.M.S. That statute reads as follows:

"In all proceedings for termination of parental rights of a child, except in cases where the parents have consented to the termination or have abandoned the child, an investigation and social study shall be made by the juvenile officer, the state division of welfare, or other public or private agency authorized or licensed to care for children as directed by the court and a written report shall be made to the court to aid the court in determining whether the termination is in the best interest of the child, and it shall include such matters as the parental background, the fitness and capacity of the parents to discharge parental responsibilities, the child's home, present adjustment, physical and mental condition and such other facts as are pertinent to the determination."

Such omission, appellant submits, is a fatal procedural error. In the alternative, he suggests that if such study was, in fact, made, and a report thereof was submitted to the court, "the trial court held the existence of the report to be privileged information." We accept this latter aspect of the contention as charging the court with error in considering the social study report (or reports) to be confidential matter and withholding it from access by the parents.

It is obvious from the tenor of appellant's argument on the first phase of the instant question that he is uncertain whether or not an investigative social study report had in fact been submitted to the court as required by Section 211.491. Appellant's uncertainty is understandable, because there is no direct testimony that a report of that nature was filed, and for the further reason the court held as confidential, and denied the parents access to, any investigative reports that had been submitted by the welfare department, the agency charged with the children's supervision. This court has taken means to inform itself definitely as to whether the report required by Section 211.491 was made and submitted to the trial court. Under authority of Civil Rule 81.12(c) (formerly 82.12(c) ) we have, by appropriate order, obtained possession of the complete court file in the cause and examined it. Therein we find on file, as documents submitted to the court between the years 1960 and 1970, numerous social study reports made by various social workers on behalf of the welfare department, relative to the subject matter of inquiry in this case. The last report filed was submitted February 26, 1970, and is identified by its own language as a report of an investigative study made for the specific purposes of the instant termination proceeding, and the hearing on the parents' motion to effect visitation privileges. In that particular, the requirements of Section 211.491 were satisfied.

In order to treat the second phase of the instant point, (whether the court erred in holding the welfare department's social studies to be confidential material) it is necessary to refer to certain remarks of the court and colloquy occurring during the trial.

During cross-examination of a welfare worker called as a witness by plaintiff juvenile officer, counsel for defendants inquired whether investigative reports had been submitted to the court, and requested that she give the dates of any such reports. Thereupon counsel for plaintiff interposed

---

1. For a comprehensive discussion of waiver of trial by jury see Meadowbrook Country Club v. Davis, Mo.Sup., 421 S.W.2d 769, 772.

objection to the inquiry, and proceedings ensued as follows:

"MR. BELT (defendants' counsel): Thank you. Your Honor, if I may, I would like to inquire of Mrs. Pettyjohn whether or not reports were made to the Court.

MR. MAYBERRY (plaintiff's counsel): I think this is carrying on long enough. It's a matter of court record as to whether or not they have or have not been made.

MR. BELT: I don't find them in the file, is the reason for the inquiry.

THE COURT: It is my understanding the reports of the welfare office to the court are confidential, and not necessarily to be revealed to counsel on either side. They're not to be considered by the Court. The Court is not to consider them in its determination of the issues. That is my understanding. * * *

* * * I think if the inquiry is merely as to reports, I think that is actually privileged, under the Statutes. It is not in evidence and not to be considered by the Court.

MR. BELT: As to whether the reports were made or not?

THE COURT: Right. The fact they were made, I think would not—since the reports themselves are not admissible and will not be considered, I don't think the fact they were made would have any real bearing. What relevance would they have, that a report had been made?"

The court adhered to and carried into effect its pronouncement that "the reports of the welfare office are confidential." Insofar as the record shows, those documents have been held secret and have not been revealed to the parents. However, with respect to whether the court in deciding the case took into consideration the welfare workers' reports, there is some indication from the court's own remarks, at the conclusion of the trial, that the court had relaxed its earlier expressed view of the question and, accordingly, intended to take the reports into consideration. Taking the case under advisement, the court commented, " * * * there is a very voluminous file here which I think bears more careful examination by the court. It is also well that the court review the evidence which has been adduced at this hearing today." Continuing, the court also remarked, "I think it appropriate at this time for the court to take the matter under advisement until it has an opportunity to examine these things * * *." Furthermore, we do not feel justified in believing the court rejected the reports as instrumentalities bearing on the decision by ignoring the provision of Sec. 211.491 V.A.M.S. that "[W]ritten report shall be made to the court *to aid the court in determining whether the termination is in the best interest of the child"*. (Emphasis supplied.)

■ It is our opinion that the court erred in withholding from the parties as confidential matter, not only the report submitted on February 26, 1970, specifically for purposes of the trial, but also the numerous additional reports, earlier submitted, which likewise bore directly upon pertinent subjects of inquiry enumerated in Sec. 211.491 V.A.M.S. as "the parental background, the fitness and capacity of the parents to discharge parental responsibilities, the child's home, present adjustment, physical and mental condition and such other facts as are pertinent to the determination." Denial of access to the investigative reports was in disregard of specific statutory provision and violated basic standards of constitutional due process, under which the litigant must have full opportunity to be heard, and to defend, enforce and protect his natural rights. Under the protection of due process it is the fundamental right of a party to know the claims of his opponent, to hear evidence submitted against him, to confront and cross-examine witnesses who depose against him, and to rebut the testimony of such witnesses by evidence on his own be-

half. 16A C.J.S. Constitutional Law, § 622, pp. 824–825. These enumerated rights are specifically recognized and guaranteed by the very body of statutes under which this proceeding was instituted. Sec. 211.461 V.A.M.S. provides that:

> "* * * the parent or parents of the child may require any and all investigating welfare agency personnel connected with the particular case to testify, without immunity or privilege, and subject to the rules of cross-examination." (Italics supplied.)

Thus, the quoted statutory provision clearly affords the parents here concerned the unqualified right to summon and cross-examine all individual welfare workers, without exception, who had submitted investigative reports "connected with" this particular case. In order to call those persons as witnesses, it would be necessary to know their identity. Practical considerations suggest to us that the primary and most directly efficacious means of acquiring that knowledge would be by inspection of the reports themselves, and that in order to cross-examine witnesses as to the subject matter and verity of reports they had submitted, such reports must be made available for that purpose. Denial of those opportunities violated the fundamental principle of Anglo Saxon law that the decision of a court must be based on evidence produced in open court at a fair trial, and contravened the mandate of Section 211.461 V.A.M.S. hereinabove quoted.

■ As our courts have uniformly stated, a proceeding to terminate parental rights is a drastic remedy of utmost gravity, since it contemplates complete and final severance of all legal rights, privileges, duties and obligations of the parent and child with respect to each other. In re Taylor, Mo.App., 419 S.W.2d 473, In re C—, Mo.App., 468 S.W.2d 689, In re M— and M—, Mo.App., 446 S.W.2d 508, and In the interest of D— J— A—, Mo.App., 477 S.W.2d 718. The power of a Missouri court to effectuate such a result derives solely from statutory enactments entitled "Termination of Parental Rights" (V.A.M.S. Sections 211.440–211.540). That body of laws is a complete code within itself, and proceedings thereunder must be in strict accordance with its terms. *"The awesome power vested in such a court to destroy the parent-child relationship must be exercised in accordance with the due process fixed by the law, and is legally effectual only if the specified procedures are punctiliously applied."* (Emphasis supplied.) In re M—, Mo.App., 446 S.W.2d 508. The court's refusal to follow and allow the procedures contemplated by Section 211.461 V.A.M.S., and required by due process,[2] is such error as to vitiate the judgment.[3]

2. According to definition by the Supreme Court of Missouri, " 'Due process of law' means according to the settled course of judicial proceedings, * * *." City of St. Louis v. Galt, 179 Mo. 8, 77 S.W. 876.

3. Our view that reports of social investigation submitted in termination proceedings should be disclosed to interested parties is shared by writers of authoritative articles pertaining to the law of child adoption, which procedure, when invoked to a final judgment of adoption, results in termination of the natural parents' rights, with the same legal effect that would result from a judgment terminating parental rights rendered in a proceeding under Termination of Parental Rights statutes.

Following enactment of Missouri's present adoption laws in 1948, an article by Harold S. Cook and Fred A. Eppenberger entitled, "The New Adoption Act" was published in the September 1948, Missouri Bar Journal. The authors therein analyzed the act in detail, particularly as to changes made. Specific attention was directed to Section 9612a (present 453.070) which, as a departure from the old statute, required that a "full" social investigation be made and submitted to the court. Relative to that requirement the article states: "*A written report of the investigation must be submitted to the Court and should, of course, be open to inspection by the interested parties, being a part of the Court's record in the proceedings.*" (Italics ours.)

Although we find no Missouri cases bearing substantially on the question presently discussed, courts in numerous other states have frequently ruled, in actions to terminate parental rights, adoption cases, "dependency" and "neglect" cases, and in proceedings between parties contesting for child custody, that the consideration of investigative reports, without disclosure of their contents to interested parties, and without opportunity to cross-examine and rebut, is a denial of due process. Illustrative examples are here noted.

In Williams v. Williams, 8 Ill.App.2d 1, 130 N.E.2d 291, intervening foster parents sought legal custody of a child previously left in their care by its mother. Prior to trial the Bureau of Public Welfare investigated the case and made report to the court. During trial, counsel for intervening petitioners asked to see the report. Declining that request, the trial court stated, "Well, it is a confidential report. It is only for the purpose of the court. * * *." Reversing the trial court, the appellate court said:

"From a reading of the record in the instant case it is manifest that the trial judge in directing the Cook County Bureau of·Welfare to make an investigation of the respective homes of defendant and the Martins was motivated only by a desire to place the minor child in a suitable home. But, in our view under the authorities cited this practice is clearly in violation of the declared policy of the law in this State. Here the confidential report was not available to counsel for either party nor were the sources of information contained in the report identifiable. So far as the record shows the anonymous author of this report was not sworn nor was he available for cross-examination.

"We are not unmindful of the rule defendant suggests that in a trial by the court without a jury it will be presumed that the trial judge did not consider immaterial or improper evidence in reaching his decision. In our opinion that rule is not applicable in the present case for the reason that the use of outside investigations and confidential reports contravenes the American ideal of due process of law."

In the case of Hollingsworth v. Kohler, Tex.Civ.App., 195 S.W.2d 563, custody was contested by the natural parents of a child, as against the claims of other parties. The trial court referred the case to the welfare department for an investigative report. The contents of the report were not disclosed to the parties, nor were the parties given opportunity to examine persons who made the report, to determine the source of the information given to the investigator, or to test the credibility, bias, prejudice or weight to be given such evidence. Reversing the trial court's award, the appellate court commented:

"We are sure the action taken by the court below was prompted solely by a desire to do that which would result to the best interest of the child, and such zeal on the part of the court is highly commendable; but we believe he went far beyond narrow technicalities when he considered the report of the Welfare Department and based his judgment in part upon the same, especially since the litigants were deprived of the right to know the character of the evidence incorporated therein, who had given it and under

A subsequent article entitled "Adoption Revisited" by Harold S. Cook, was published in Vol. 27, Missouri Law Review, 391, in which the author states: *"As pointed out fourteen years ago, the written report of the social investigation required by section 453.070 to be submitted to the court should be made available to all interested parties.* Unfortunately, the juvenile courts, at least in the metropolitan St. Louis area, have considered this report a confidential document and have not made it so available. It is submitted that it could be made available by subpoena. The decision of a case on evidence read by the judge and the guardian ad litem, but not available to the parties or their attorneys, is not recommended." (Italics ours.)

what circumstances it was given. The litigants were further deprived of the right to examine under oath the one who made the report, the witnesses who gave the information to the investigator. They had no opportunity to determine the source of their knowledge of the facts given, or to test their credibility, their biases or prejudices or the weight to be given to such evidence. Such procedure deprives a litigant of his day in court. * * * Hollingsworth lost his case without knowing what evidence he had lost on and without an opportunity of rebutting it."

In State in Interest of Pilling v. Lance, 23 Utah 2d 407, 464 P.2d 395, the state undertook to terminate parental rights. From a judgment of termination, the parents appealed, contending the trial court erred by considering a "social file" in making its determination. Reversing the Supreme Court said:

"In the instant action, the use of the social file was a denial of due process of law, since appellant had no opportunity to know, cross-examine, explain or rebut this secret evidence."

In the case of In re Chandler, 230 Or. 452, 370 P.2d 626, a father petitioned for custody of his child, which had been made a ward of the court and placed in a foster home. During the trial, the father's counsel was denied access to the welfare department's reports relative to the child. Such denial was held improper by the Supreme Court in the following language:

"In this case the state had intervened in a family to take a child from the custody of its parent. It was placed in the custody of the Welfare Department. The conduct of the case workers who were supervising the child and the relationship of these people to the child and to the parent and stepmother was directly in issue. During the trial, counsel sought to elicit certain information from this file

and was unable to satisfactorily obtain it. He then moved to put the entire file in evidence. This was denied. However, the real question presented here is, should counsel have been permitted reasonable access to the file in order to use that part of it that was relevant to the issues being presented to the court? We think the court should have permitted such an examination. * * * "It would be unthinkable to say that an agency of the state may seize a person's child and then be the sole judge of how much of the evidence in respect to the agency's conduct it will refuse to divulge. * * *

"An opportunity to put it in evidence should have been allowed."

In Stanford v. Stanford, 266 Minn. 250, 123 N.W.2d 187, the court said:

"We do not condemn the practice of using court agencies to make investigations and reports on custody questions. Where the sole issue is what will best serve the welfare of the child, such reports are an invaluable aid to the court in determining the question. Their use should be encouraged, but care should be taken to give fair notice of the contents of such reports to the parties involved so as to afford them every opportunity to test the credibility of the reporter through cross-examination or otherwise and to meet or answer every adverse fact or inference included therein."

Also see: Rea v. Rea, 195 Ore. 352, 245 P.2d 884, 35 A.L.R.2d 612; Kesseler v. Kesseler, 10 N.Y.2d 445, 225 N.Y.S.2d 1, 180 N.E.2d 402; Godden v. Godden, 158 Neb. 246, 63 N.W.2d 151; State v. Lamar, Ore. App., 490 P.2d 191; McGuire v. McGuire, Fla.App., 140 So.2d 354; Wells v. Wells, Ky.App., 406 S.W.2d 157; Lincoln v. Lincoln, 24 N.Y.2d 270, 299 N.Y.S.2d 842, 247 N.E.2d 659; In re Rosmis, 26 Ill.App.2d 226, 167 N.E.2d 826; and Oltmanns v. Oltmanns, 265 Minn. 377, 121 N.W.2d 779.[4]

4. For articles on social investigation reports and their use, see: "Social Investigation Reports in the Juvenile Court" by Erwin G. Krasnow, Vol. 12 Crime &

Appellant's brief presents another complaint—that "the court erred in considering the petition amended to the date of hearing" and considering evidence relative to the parents' treatment of the children during the time between the filing of the petition and the date of the hearing. Appellant argues that such issue was limited by statute to "one year or more immediately prior to the filing of the hearing." This complaint needs no decision for the purpose of this appeal. However, considering that the cause may be retried, we recommend that the period of time within which defendant parents are charged with conduct warranting termination of their parental rights should be defined and particularized by written pleading, duly filed.

The judgment is reversed and the cause is remanded.

SHANGLER, C. J., and DIXON, J., concur.

PRITCHARD, WASSERSTROM, and SWOFFORD, JJ., not participating because not members of the court at time case was submitted.

Delinquency, Apr. 1966, p. 151; "Use of Extra-Record Information in Custody Cases", Vol. 24, University of Chicago Law Review (1957) p. 349; "Child Neglect: Due Process For the Parent", 70 Columbia Law Review (1970) p. 465; "Juvenile Social Records and Criminal Discovery", 35 Mo.Law Review (1970) 113.